No. 93-477

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN THE MATTER OF THE ADOPTION OF

J.M.H. and S.B.H.,
        Minors.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
               In and for the County of Gallatin,
               The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

               Bryan L. Asay; Kelley & Asay Law Firm, Helena,
               Montana

        For Respondent:

               Peter S. Lineberger; Lineberger, Walsh & McKenna,
               Bozeman, Montana

FILED

MAR 24 1994

Filed: *Ed Smith*
    CLERK OF SUPREME COURT
        STATE OF MONTANA

Submitted on Briefs:  January 20, 1994

              Decided:  March 24, 1994

_____
            Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the Eighteenth Judicial District Court, Gallatin County. The District Court granted the adoptive father's petition to allow the adoption of J.M.H. and S.B.H. (the children) to proceed without the natural father's consent. The court further concluded that the natural father was able to pay child support, but failed to do so. The natural father appeals the District Court's ruling on the consent issue and the court's denial of a continuance of the May 11, 1993, "best interest" hearing. We affirm.

The issues are:

1. Did the District Court err by finding that the natural father, though able, failed to pay child support?

2. Did the natural father waive his right to be present at the May 11, 1993, "best interest" hearing?

Natural father, John Heikkila (John), and natural mother, Karen Beth Sorensen (Karen), were married in 1983 while attending Montana State University in Bozeman, Montana. After the birth of their first daughter, the couple moved to Colorado so that John could attend veterinary school. The couple's second daughter was born in 1986. In July 1987, before John graduated from veterinary school, the couple separated. The marriage was dissolved in Colorado on December 28, 1988.

The final decree of dissolution addressed, among other things, matters of child custody, visitation, child support and marital

debts. John and Karen were awarded joint custody of the children. Karen was named the primary physical custodian. The parties agreed that Karen and the children would return to Montana. John was granted "liberal and generous visitation" in Montana. He was also granted up to ten days of visitation per summer in Colorado, so long as John's sister escorted the children.

The Colorado court also ordered John to pay child support of $200 per month, less than the amount required by Colorado's Child Support Guidelines, due to his student status. Visitation and the monthly child support payments were to be renegotiated after John's graduation from veterinary school or upon securing full-time employment.

Karen returned to Bozeman after the dissolution. While there, she met Timothy Lee Barth (Tim). They were married on December 22, 1990. In May 1990, John graduated, became licensed, and secured a position as a veterinarian in Colorado. Despite the Colorado court's order, John and Karen never renegotiated visitation and child support.

While John paid $2,050 in child support over the years, he still owes $10,600 in back payments. John's total debts, including sizable student loans, are about $70,000. John's tax returns indicated that in 1990, the year he graduated and worked for six months, he earned approximately $15,000. In 1991, he earned $31,367, and in 1992, $32,400.

Two years after Tim and Karen were married, Tim sought to adopt the children. John made numerous attempts to delay and

3

prevent Tim's adoption of his children. Tim's petition to the Eighteenth Judicial District Court stated in part:

> Since the marriage between KAREN BARTH and the Petitioner, TIMOTHY LEE BARTH, both minor children have resided with the above parents as their natural child[ren].
>
> . . .
>
> The Petitioner desires to adopt [J.M.H.] and [S.B.H.] as his own children, to be treated in all respects as if they were the natural children of the Petitioner, to take the family name of BARTH, . . . and be entitled to the support, affection and inheritance of the Petitioner in all respects establishing the relationship of parent and child between the Petitioner and [the children].

The court set an adoption hearing for May 11, 1993. In an effort to prevent this hearing, John filed a petition for writ of mandamus with this Court. John's petition was denied on May 11, 1993--the same day that the District Court made its findings of fact, conclusions of law and final decree of adoption, granting Tim's request. John appeals. We affirm.

I

Did the District Court err by finding that the natural father, though able, failed to pay child support?

During the period in which he accrued child support arrearages, John chose to repay his general creditors rather than fulfill his child support obligation. Karen, on the other hand, returned to Montana, where she attended and graduated from Montana State University. At the time she graduated, Karen owed her parents more than $10,000. Her financial situation was compounded because, during most of that period, she was not receiving her $200 monthly child support payments.

4

John testified that prior to the dissolution, Karen received money from a trust fund established for Karen's use by her parents. John believes the fund is valued at $60,000 to $70,000, and it largely supported the couple in Colorado. After Tim and Karen were married, with the exception of a two-month period in which John sent $250 in child support, Tim financially supported Karen and the children.

John contends that before and since his graduation in May 1990, he was too poor to make any payments other than those he made. He asserts that he only earned $23,444 after taxes, and had expenses of $24,220, in 1990. John argues that he has: juggled student loans and debts of $72,000; enjoyed no luxuries; no health insurance; no savings; no television; no boat; no snowmobile; one credit card through a gas company; and at one point, he even lost electrical service to his home due to a delinquent bill.

John claims to have a fundamental right--specifically, a liberty interest--in his children, which prevents anyone from "taking" his children without his consent. See § 48-8-111(1), MCA. John asserts that Tim, who wishes to adopt his children, must establish by clear and convincing evidence that John was able to contribute to the support of the children the year before Tim filed the adoption petition.

He argues that Montana law requires strict compliance with the statute that the burden of proof rests with Tim. John contends that he presented overwhelming evidence of his inability to pay during the period in question; that Tim presented no evidence of

5

John's failure to pay; and that Tim failed to meet his burden of proof. Because no clear and convincing evidence exists that he was able to pay support, John argues that the District Court's decision must be reversed.

In support of his contention, John refers this Court to § 40-8-111(1), MCA, which provides in pertinent part:

> **Consent required for adoption.** (1) An adoption of a child may be decreed when there have been filed written consents to adoption executed by:
>
> (a) both parents, if living, or the surviving parent of a child, provided that consent is not required from a father or mother:
>
> . . .
>
> (v) if it is proven to the satisfaction of the court that the father or mother, if able, has not contributed to the support of the child during a period of 1 year before the filing of a petition for adoption; . . . .

The issue in dispute at the November 20, 1992, hearing was John's ability to pay. John argues that the burden of proving his ability to pay during the year prior to the filing of the petition lies with Tim. Adoption of S.L.R. (1982), 196 Mont. 411, 640 P.2d 886, 889. Tim met this burden by showing that John earned about $24,000 after taxes, paid $8,376 in student loans, and made payments to other general creditors, including his divorce lawyer. The District Court concluded that, although he was able to pay, he did not contribute to the support of his children in the year before Tim filed the adoption petition. In so finding, the court determined that John's consent to the adoption was not required.

We will not overturn a district court's findings unless they are clearly erroneous. Rule 52(a), M.R.Civ.P.; Adoption of B.L.P.

6

(1986), 224 Mont. 182, 728 P.2d 803. This Court has "long adhered to the standard of review which provides that we will consider only whether substantial credible evidence supports the findings and conclusions of the trial court." B.L.P., 728 P.2d at 805 (citation omitted).

In B.L.P., this Court enunciated this standard of review in discussing whether the appellant was able to make support payments during the year immediately prior to the date the adoption petition was filed. John refers to the "clear and convincing" standard, which is applicable to the evidence presented at the district court level. However, it is unnecessary that this Court retry the facts under the "clear and convincing" standard. Rather, we review the district court's findings under the clearly erroneous and substantial credible evidence standards.

At the November 22nd hearing, when asked if he chose to repay creditors rather than pay child support, John stated:

> It hasn't been in preference. They are not more important than my daughters, but it has been paid more out of necessity. I am aware that Karen and Tim are not in need of the money. My girls do not suffer because of a lack of that money and these other bills, they're--at the present time they had the capacity to hurt me more than what I figured Karen would at that time.

This is not a case of equitable estoppel. Tim and Karen did not refuse any child support offers by John "in order to later assert at the adoption proceeding that [John's] consent was not necessary." See Adoption of D.J.V. (1990), 224 Mont. 209, 214, 796 P.2d 1076, 1079. Rather, John "has not performed his legal responsibility as a parent." See D.J.V., 796 P.2d at 1079.

7

In a memorandum supporting its December 21, 1992, findings of fact and conclusions of law, the District Court stated:

> There is no question that Dr. Heikkila's borrowings for school have left him in financial trouble. This court cannot accept, however, that the payment of the minimal amount of child support would have led to the father's downfall. Dr. Heikkila has shown that he can juggle his creditors, especially the student loans, and the court concludes that he could have done so while supporting his children. Indeed, he had a better payment record when he had little earnings as a student.

We agree with the District Court. Parents are obligated to support their children. Sections 40-6-211 and 40-6-214, MCA. The District Court's determination that John was able to support his children, yet failed to do so, is supported by substantial credible evidence. We hold that the District Court's findings were not clearly erroneous.

## II

Did the natural father waive his right to be present at the May 11, 1993, "best interest" hearing?

The District Court notified all parties by its Order of March 11, 1993, that a "best interest" hearing would be held on May 11, 1993. On May 4, 1993, John requested a continuance of the May 11th hearing. The reason for John's request was that he had secured counsel, who would need a "reasonable amount of time to familiarize himself with the case." The District Court denied John's request on May 8th. Neither John nor his attorney appeared at the May 11th adoption hearing. John argues that the District Court abused its discretion by refusing to grant the continuance he requested.

Ruling on a motion for a continuance is in the sound

8

discretion of the trial court. See Fields v. Wells (1989), 239 Mont. 392, 780 P.2d 1141; In re Marriage of Robbins (1985), 219 Mont. 130, 711 P.2d 1247. In the case before us, John had notice of the hearing, and ample time to secure counsel and arrange transportation from Colorado. Instead, he chose not to attend the hearing or to have counsel represent him. John was afforded the opportunity to attend the hearing, which satisfied all due process requirements as set out in Montana law. See, e.g., Adoption of R.M. (1990), 241 Mont. 111, 785 P.2d 709. Though adequately notified, John effectively waived his right to claim due process violations by failing to attend or dispatch an attorney to the hearing. We hold that the District Court acted well within its discretion when denying John's motion for a continuance.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

9

Justice James C. Nelson specially concurs:

I concur with the Court's opinion. Something more, however, needs to be said about Dr. Heikkila's "ability" to pay.

While the dissent has correctly set forth the law with regard to the issue of a parent's ability to pay, I disagree that, on the facts of this case, the natural father was unable to support his children. True, despite his employment as a doctor of veterinary medicine, his expenses exceed his income. True, also, he is deeply in debt -- largely because of student loans which he used to finance his higher education. Agreed, some of his debt is delinquent. Conceded, he lives a spartan life without luxuries and amenities -- no television, savings, investments, credit cards, health insurance, boat or snowmobile.

No doubt about it, Dr. Heikkila's financial situation is bleak. Notwithstanding, he is no worse off than millions of Americans, who, despite the inconvenience of bills which exceed income, dunning creditors, unemployment, sickness, debt, divorce and the fact that whatever can go wrong usually does, somehow find the money each month to support their children. Those families and single parents take on second and third jobs; they put off paying bills; they borrow and scrimp and sacrifice and go on welfare, but, nevertheless, from their inadequate incomes their kids get fed, clothed and sheltered <u>first</u>. It is, frankly, of small concern to a hungry child that his parent's student loan is delinquent.

I agree with the dissent. The parent-child relationship is likely the most important human relationship that exists. But with

the _right_ to be a parent go some _responsibilities_, not the least of which is the obligation to financially support one's children, whether they live in one's own home or with the ex-spouse.

Unfortunately, Dr. Heikkila's perception of his parental obligation of support mirrors that of "deadbeat" parents nationwide who, on the one hand, sanctimoniously demand their constitutional right to parent, but who, on the other hand, are more than willing to let the custodial ex-spouse, some other family member or third party and/or the taxpayer shoulder the entire burden of feeding, clothing and sheltering the children.

Dr. Heikkila is not _unable_ to support his children; he just chooses to spend what income he has on obligations other than child support. His voluntary spending priorities, sadly, include himself and his general creditors first, and his children not at all. That his spending priorities are misplaced does not equate to an inability to support his children.

The District Court's decision was correct, and so is this Court's.

_____
Justice

11

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion.

A natural parent has a "fundamental liberty interest" in his continuing parental relationship with his children. *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95, 71 L. Ed. 2d 599, 606; *see Matter of R.B., Jr.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848. While allowing for the fact that there is great variation in the quality of parent-child relationships, it still may be the most important human relationship that exists. It is for that reason that our courts and legislatures have allowed termination of that relationship without a parent's consent under only the most extreme circumstances. Those circumstances require not just lack of support, but a degree of culpability that is strikingly absent in this case.

Section 40-8-111, MCA, requires consent of both living natural parents prior to adoption except for limited circumstances. According to subsection (1)(a)(v) of that statute, failure to contribute to the child's support during the year preceding the petition for adoption is only a basis for waiving consent when it can be proven that the noncontributing parent was "able" to contribute to the child's support.

We have been insistent in the past that someone petitioning to adopt over the objection of a natural parent must prove not only the absence of support, but that the nonsupporting parent had the

ability to contribute to the child's support. In *Matter of Adoption of J.B.T.* (1991), 250 Mont. 205, 207-08, 819 P.2d 178, 179, we stated:

> For the court to find that a parent's consent is not necessary to terminate its parental rights, the burden of proof requires that there must be clear and convincing evidence that the parent has not contributed to the support of the child for one year <u>and was able to do so</u>. *In re Adoption of S.E.* (1988), 232 Mont. 31, 35, 755 P.2d 27, 29. Hence, the statute requires a two-tier analysis before parental rights can be terminated. *Matter of Adoption of R.A.S.* (1984), 208 Mont. 438, 442, 679 P.2d 220, 223. First, the court must decide if the nonconsenting parent failed to contribute to the support of the child during a period of one year prior to the filing of the petition. The court must then determine if the nonconsenting parent had the ability to pay child support. *Matter of Adoption of S.L.R.* (1982), 196 Mont. 411, 413-14, 640 P.2d 886, 887. <u>The burden of proof falls upon the petitioner to show that the two-prong test is met.</u> *Adoption of R.A.S.*, 679 P.2d at 223; *Adoption of S.L.R.*, 640 P.2d at 886-87. Because the natural parent can forever lose parental rights, this Court requires strict compliance with the statute. *In re Adoption of Biery* (1974), 164 Mont. 353, 359, 522 P.2d 1377, 1380. [Emphasis added].

Based upon the standard articulated in the preceding case, the natural father in this case was entitled to a directed verdict following petitioner's proof.

Petitioner called three witnesses, none of whom had anything relevant to say about the father's ability to support his two daughters during the previous year. The first witness was Robert Blair, a veterinarian from California, who had graduated from veterinary school with the natural father. Basically he testified to what he had earned in California since graduation. So what?

13

The next witness was Timothy Barth, the petitioner. He testified that during the previous year the two children who were the subject of the petition had not received support from their natural father, and that to his knowledge the natural father was employed. He also testified that the natural father drove a 1990 blue Chevy pickup. No testimony was given about the father's ability to pay.

The final witness called by petitioner was Karen Barth, the natural mother of the children. She testified that she had received no child support payments during the previous year, and that pursuant to the decree of dissolution, her former husband was obligated to pay $200 a month. She offered no testimony about his ability to pay child support during the previous year.

The aforementioned witnesses were the sum total of evidence presented by petitioner. As a matter of law, based on our previous decisions, petitioner did not satisfy his burden of proof, and his petition should have been dismissed by the District Court at the conclusion of his evidence.

The only witness to testify about the natural father's ability to pay was the father himself. He acknowledged that at the time of the hearing he was a practicing veterinarian and that his gross income during the preceding year had been $30,000 to $32,000. However, it was also uncontroverted that his net income for the 12 months preceding the date on which the petition was filed in this case was $23,444, and that his basic living expenses, for bare

14

necessities, during the same period of time were $24,220. In fact, in its Finding of Fact No. 12 the District Court listed those expenses from which the $24,000 figure was arrived at as follows:

12. In the year preceding the filing of the adoption petition, John Heikkila's living expenses were as follows:

| Category | Annual | Monthly |
|---|---|---|
| Rent | $3180 | $ 265 |
| Utilities | 840 | 70 |
| Food | 3650 | 300 |
| Clothing | 300 | 25 |
| Entertainment | 180 | 15 |
| Personal care | 416 | 35 |
| Pickup | 2513 | 359 |
| Insurance | 1395 | 115 |
| Fuel | 1200 | 100 |
| Maintenance | 280 | 24 |
| License and Dues | 566 | 47 |
| Attorney Fees | 600 | 50 |
| Life Insurance | 564 | 47 |
| Student Loans | 8376 | 698 |
| Gifts | 160 | 14 |
| Totals | $24,220 | $2,164 |

The above figures only take into account those bills that the father actually paid. He had many other bills which he was juggling and periodically was unable to pay. He was in default on three different college loans, and he was also in default on loans which he owed to his mother, his uncle, the Hamilton Cattle Company, and his former wife's parents. At one time his electricity was shut off for late payment.

He had no television, no savings account, no investments, no major credit cards, and no health insurance.

His total debt at the time of trial was $72,000, including $52,000 for student loans, over $10,000 in back due child support, and the various other debts that have been mentioned. He has not filed for bankruptcy because he testified that the student loans and the child support could not be discharged and all that would be accomplished would be the loss of his pickup, which is necessary for his employment.

At no time since his graduation from veterinary school has the natural father's income equalled his basic living expenses, and there have been times during that period when he went without a telephone and shared expenses with another in order to survive.

Under these circumstances, what did the District Court, and what does the majority, expect? The question in this case is not whether the natural father's obligation for child support should be discharged. His debt to his children continues to accrue and will never be discharged, and can be collected when his financial situation improves to the point where he is able to pay it. The question in this case is whether his right to parenthood should be terminated because he willfully refused to pay child support when he was able to do so. We have in the past articulated standards by which "ability" to pay child support is to be determined. Those standards have been ignored in the majority opinion.

In our recent decision in *In re Adoption of V.R.O. and V.N.O.* (1991), 250 Mont. 517, 822 P.2d 83, we reiterated the following criteria to

16

be considered when determining whether a nonpaying natural parent had the ability to make child support payments:

> Because parental rights involve a fundamental liberty interest, a judicial decree terminating such rights must be supported by clear and convincing evidence. *Matter of Adoption of R.M.* (1990), 241 Mont. 111, 115, 785 P.2d 709, 711. In order to determine whether a parent is "able" to contribute to child support, the trial court must examine several factors. These factors include:
> 1) The parent's ability to earn an income;
> 2) The parent's willingness to earn an income and support his child;
> 3) The availability of jobs;
> 4) The parent's use of his funds to provide himself only with the bare necessities of life prior to providing support for his child.
> *Matter of Adoption of K.L.J.L.* (1986), 224 Mont. 418, 423, 730 P.2d 1135, 1139.

*Adoption of V.R.O.*, 822 P.2d at 85.

The first three factors are not in dispute. The fourth factor is the factor which was never mentioned by the District Court, nor the majority in this case. After reviewing the transcript of the hearing in this case, and the District Court's findings of fact, I conclude that the natural father in this case had no money left after providing himself with the bare necessities of life, and therefore, was, as a matter of law, unable to contribute to the support of his children during the period of time preceding the petition for adoption.

Notwithstanding the high-minded tone of the concurring opinion, the result in this case ignores existing law regarding what constitutes the "ability" to pay and ignores the best

17

interests of the children. Notwithstanding the heroic examples of self-sacrifice immortalized in the concurring opinion, termination of a parent-child relationship is a draconian remedy for parents who do not measure up to the concurring author's ideals for parenthood. The sermonizing in the concurring opinion, which captures the real essence of the majority's thinking, may have some place in a church service, but is highly irrelevant to the legal issues in this case.

Apparently it is the majority's conclusion that debts which result in collection letters and threatened suits, along with whatever subsequent execution would result, are not "necessities of life." I disagree, and so would the natural father's creditors. If the debts can be reduced to judgment, and a subsequent order entered enforcing the judgment, then it is certainly "necessary" that they be paid.

While the enforcement of child support obligations, to the extent possible, is certainly a commendable concern, punishing a natural parent by terminating his parental rights when support is not possible does not serve the best interests of his children, or anyone else. His children are no better off financially as a result of this decision, and may certainly be harmed by their father's future inability to maintain or establish any relationship with them. While the majority may now feel "tougher" on nonsupporting parents, the interests of the children seem to have been forgotten.

18

In this case, petitioner failed to satisfy his burden of proof by establishing that the natural father was "able" to make child support payments during the year preceding the date on which the petition for adoption was filed, therefore, the natural father's consent to adoption was required. For these reasons, I dissent from the majority opinion and would reverse the judgment of the District Court.

_____
Justice

March 24, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


Peter S. Lineberger
LINEBERGER, WALSH & McKENNA, P.C.
P. O. Box 6400
Bozeman, MT 59771-6400

Bryan L. Asay
KELLEY & ASAY LAW FIRM
921 Euclid Avenue
Helena, MT 59601

Charles K. Hail
Attorney at Law
2009 Oro Fino Gulch
Helena, MT 59601


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy